

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| C.V., | | No. 08-12-00088-CV |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 65th District Court |
| | § | |
| TEXAS DEPARTMENT OF FAMILY | | of El Paso County, Texas |
| AND PROTECTIVE SERVICES, | § | |
| | | (TC # 2009CM8178) |
| Appellee. | § | |

## **O P I N I O N**

This is an appeal from a judgment terminating a mother's parental rights to her six children. The Texas Department of Family and Protective Services (TDFPS) sought termination of both the mother's and the father's parental rights. After a bench trial, the court found TDFPS presented clear and convincing evidence establishing that Appellant:

> knowingly placed or knowingly allowed the [children] to remain in conditions or surroundings which endanger the physical or emotional well-being of the [children];

> engaged in conduct or knowingly placed the [children] with persons who engaged in conduct which endangers the physical or emotional well-being of the [children];

> used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and:

(i) failed to complete a court-ordered substance abuse treatment program; or

(ii) after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance;

*See* TEX.FAM.CODE ANN. §§§ 161.001(D), (E), (P)(West Supp. 2012). The trial court also found that it was in the best interest of the children to terminate the parental relationship. The trial court did not terminate the rights of the father and he is not a party to this appeal.

On appeal, C.V. challenges the sufficiency of the evidence to support the best interest finding. She concedes that the evidence was sufficient to satisfy the three statutory predicates. For the reasons that follow, we affirm.

**FACTUAL SUMMARY**

*Foundational Premise*

We begin with the fundamental premise that children need stability, security, consistency, and continuity. These common threads of a child's well-being relate not only to physical caretaking but also to psychological parenting. When the threads are woven into daily life, the fabric called family swaddles the child and promotes physical and emotional growth. Threads left dangling often unravel into chaos. And that word -- chaos -- is repeatedly found throughout the record here.

*The Parents*

C.V. and E.G. are the biological parents of all six children and have been together for approximately fifteen years. The record reflects, however, that C.V. was married to another man, J.H., on July 27, 2004 and never divorced him. C.V. claimed at trial that the marriage was immigration-related and that she considered E.G. her common law husband. In any event, E.G. was adjudicated the father of all of the children.

*The Children*

For clarity and ease of reference, we will refer to the children by number rather than extended sequential initials.  As we will discuss more thoroughly below, the children were removed in December 2009.  The final hearing on the merits began June 1, 2011 and was tried in piecemeal fashion until closing arguments on January 6, 2012.  During the trial, the children celebrated birthdays and different witnesses testified to different ages of the children depending upon the dates of their testimony.

Child 1 was nine years old when trial began and was living in her fifth foster home.  She was eleven years old by the time the trial concluded.  Her current clinical therapist, Irene Cadena, testified that the child suffers from anxiety, depression, nightmares, and outbursts of anger.  She has a history of self-harm by cutting and has been hospitalized due to outrageous anger, which involved hitting and kicking walls.  The child's initial therapist, Mara Hernandez, described the girl's severe aggression, assaultive behavior, severe emotional problems, sexualized behavior, and lack of boundaries.  She is unable to follow instructions, respect limits, or abide by social order, and she shows no empathy for the feelings of others.  Consequently, she has been medicated and hospitalized at University Behavioral Hospital in El Paso at least five times.  Her most recent hospital stay lasted four weeks.  Child 1's sexual behavior involves pole dancing, inappropriately rubbing against other children, and acting out sexually against a sofa.  She told Hernandez that she had observed her cousins' sexual actions and had witnessed her mother engage in sexual relations at a cantina in Juarez.  She made an outcry of molestation by her cousin and her uncle to her mother, but C.V. apparently did not believe her.  On the other hand, she also alleged sexual abuse by one of her foster fathers which was disbelieved by the foster mother.  Child 1 described a crowd of people at the family home who repeatedly "fought"

and "hit each other." She related incidents of domestic violence in the family home to her foster mother and expressed fear that visitors in the home were affiliated with gangs. Cadena also addressed the issue of family violence, reciting that the child observed physical violence and she and her siblings would hide under the bed. When asked whether these incidents would negatively affect the children, Cadena emphatically answered yes. When asked, "How?" she replied:

> Well, usually children that come from homes where there's been violence, physical violence, or any type of abuse, particularly physical violence, they will enter another relationship just like that, because they feel that violence is part of love.

Cadena specifically mentioned that the girl needs stability. She lacks trust "because she has never had that trust or nurturing from her mother." Child 2 was seven years old when trial began. He has been diagnosed with ADHD and aggression, and has significant psychological and behavioral issues. He was prescribed multiple psychotropic medications and on four occasions, his foster mother took him to University Behavioral Hospital due to his suicidal thoughts, threats to others, and self-harm. The latest hospitalization lasted for six days and Dr. Moreira diagnosed him as bipolar. The foster mother explained that most of Child 2's behavioral problems occurred before and after visits with his mother, but she acknowledged this behavior could be related to his wanting to stay with her. Child 2 was placed in a residential treatment center about 70 miles from Lubbock in July 2011 because he was having idealizations of killing the foster parents and foster siblings. His clinical psychologist, Dr. Felix Carreon, noted that the boy described in graphic detail how he would kill or mutilate his foster parents if they crossed him. Dr. Carreon conducted two psychological evaluations, one in March 2010 and the second in July 2011. These tests revealed anxiety, depression, anger, and disruptive behavior. He was diagnosed with temper deregulation disorder with depression and an Axis I

diagnosis of neglect of a child. While Dr. Carreon opined that the boy improved in his functioning while in foster care, he admitted that the child's psychological testing results showed a deterioration between the two test settings with regard to social adaptive behaviors and adjustments. He explained this in his written report, noting that the most salient features regarding this child's difficulties have to do with his attachment to a family system and parents that apparently have not been able or willing to comply with the conditions necessary for reunification. He characterized this as a pathological bond to his biological parents. Dr. Carreon also noted that the boy has displayed odd and dangerous behaviors. He ate two tubes of toothpaste. After the foster father noticed a drop in electrical lighting in the home, he discovered the boy had put a nail clipper in his bedroom electric socket causing an electrical short. The boy worries about what will happen the next day and has even gone to sleep wearing his school clothes. Child 2 lies frequently and does not accept responsibility for his actions. He provokes difficulties, likes to fight and hit other children, and has poor frustration tolerance. Yet this child has qualified for gifted classification and is actually doing well in school.

Child 3 was six years when trial began. He has mild mental retardation, ADHD, hearing loss and asthma. He has suffered from encopresis and his mother admitted she never had him evaluated by a doctor. She also admitted that his behavior included aggression, tearing his pants, and biting his shirts. The boy's therapist, Mara Hernandez, testified that he made substantial progress in foster care, specifically in his moral development and behavior. His foster mother said the child arrived at her home very dirty and soiled. He had no knowledge of hygiene or table manners. She explained that the child would soil his underwear, gnaw on things with his teeth, and break things in his mouth. Katherine Valencia, a clinical treatment coordinator with the El Paso Center for Children, testified that the child would spread feces in the bathroom and

had a tendency to chew things like tennis shoes, pencils, pens, markers, clothing, and furniture. He exhibited developmental delays and was diagnosed with an anxiety disorder.

Child 4, a five-year-old, exhibited severe hyperactivity, impulsiveness, competitiveness, aggression, and outbursts of anger  His tantrums can last up to 45 minutes.  He suffers from anxiety disorder.  Although highly intelligent, he needs very close supervision because of poor judgment.  He told his foster mother that his father beat them a lot.  She described behavior problems, including aggression, destructive tendencies, and sexual awareness.

Child 5 was four years old.  Her therapist, Mara Hernandez, explained that the child exhibits the same behavioral disorders as the other children, including severe hyperactivity, physical violence, anger, poor judgment, nightmares, difficulty sleeping, fighting with siblings, and an inability to follow instruction.  Katherine Valencia added that the little girl has a mood disorder and reported that the child received speech therapy and psychiatric services.  Child 4 and 5 played a game called "mom and dad," which their foster mother described as inappropriate sexualized behavior.  At the time the behavior was first noted, the children were two and four years of age.

Child 6 was only two years old at the time of trial.  This little girl exhibited non-stop crying, pulling her hair, and hitting herself.  Katherine Valencia testified that she suffers from an unspecified disturbance of her autonomic nervous system for which she is medicated.  Even while medicated, she continued to show instability and emotional deregulation.  The child is developmentally delayed, and in need of speech and psychiatric therapy.  Mara Hernandez opined that the child needed structure and a highly stimulating environment to achieve her developmental milestones.  Child 6 could not stand to have anyone touch her and was in need of occupational therapy for sensory integration.

*Removal of the Children*

The Department received an intake in May 2009 that Child 1 had been hit with a belt by her father. CPS conducted an investigation and the mother tested positive for drugs. When she failed to attend a drug assessment, the children were voluntarily placed with their maternal grandmother. Following a police report that two of the children were found running in the street, CPS made a determination of neglect. The children were removed on December 4, 2009. Child 6, the baby, tested positive for cocaine at the time of removal. C.V. claimed she had drugs on her hands when she picked up the child. In any event, with no suitable placement options, the Department sought temporary managing conservatorship of all six children. They were placed in three separate foster homes, with the four youngest placed together.

*The Service Plan*

In safety plans, the mother was specifically ordered by the court to (1) attend all of the children's medical appointments; (2) attend a psychological evaluation; (3) attend a drug and alcohol assessment; (4) attend parenting classes; (5) submit to random drug testing; (6) refrain from using illegal substances; (7) refrain from associating with individuals having a history of using illegal substances; (8) attend therapy sessions; (9) obtain stable employment and provide proof; (10) obtain stable housing; (11) attend and complete domestic violence classes; and (12) attend and complete anger management classes. Of these requirements, C.V. completed the psychological evaluation, the drug and alcohol assessment, three parenting classes, random drug testing, and therapy sessions. She failed to attend more than ten of the children's medical appointments.

C.V. began a drug court program in January 2010. She tested positive for marijuana in April. She tested positive for ecstasy in September and was ordered to serve seven days in jail.

She completed an out-patient drug treatment program, but relapsed again, testing positive for cocaine in May 2011. At that point, the drug court recommended that she obtain in-patient treatment and offered assistance in making arrangements. Although C.V. expressed an interest, she never followed through. She was unsuccessfully discharged from the drug court program in July and the Department's plan changed from reunification to termination.

### *Visitation Between Mother and Children*

Beginning in January 2010, C.V. had supervised visitation with her children. They were originally scheduled once a week for two hours and then increased first to four hours and then to six hours. Witnesses described the supervised visitations as chaotic. It was characterized by constant fighting, punching, scratching and biting. Rather than engaging in horseplay, the children were very aggressive toward each other. C.V. would sit back and watch without intervening or redirecting the children's attention. The visitation room was child-friendly, with tables, stools, and toys. Jessica Rodriguez, one of the caseworkers, described how C.V. watched the children rather than interacting with them. Grace Gonzalez, a Department caseworker assistant, described the relationship between C.V. and the children as loving, but that the mother needed help redirecting them. The worst situation occurred when the children were playing in a park. Child 2 became "very, very violent" with Child 4. C.V. was unable to control the child on her own and, according to Gonzalez, the children "didn't take any direction from her at all." C.V. admitted to missing seven visits. According to the children's foster mother, therapist, and caseworker, C.V. showed up late at least once or twice a month and that visits were cancelled as a result. The children threw tantrums when their mother did not show up and would kick, scream, hit, and punch windows.

In September 2010, C.V. was permitted to have unsupervised visitation. The unsupervised visits stopped when C.V. tested positive for ecstasy and then resumed in late January 2011. The visits started at four hours per week and then increased to six. C.V. agreed that she would not have other individuals in her home during the visits. But she then allowed relatives to come over, including the relative that allegedly sexually assaulted Child 1. In March 2011, the unsupervised visits were stopped when one of the children was hurt when he was slammed against a wall by his cousin. No overnight visits were ever allowed. In May 2011, C.V. again tested positive for drugs. Until this point, the Department's plan was still family reunification. Thereafter, termination of the mother was the goal. The Department was looking at the paternal grandmother for placement, but she was unwilling due to other obligations.

### Needs of the Children

The caseworker, psychologist, therapist and treatment coordinator all testified about the children's needs. Department caseworker Teresa Garcia explained that the children needed stability and constant attention. Dr. Carreon testified that the children needed a stable, consistent, and nonthreatening environment. Therapist Mara Hernandez described the children as demanding and "high maintenance," needing close supervision and one-on-one attention The baby needs environmental stimulation as well as firm and consistent limits. According to Hernandez, the children's behavior related to their home environment and was not a result of placement in foster care.

> When you have that, there's a term for that adjustment disorder that can affect your mood and your behavior. But it is that, an adjustment. You usually adjust and your true self comes out once you adjust. But this seems to be the way they were always -- that was their reality. And all three children made -- or refer to that when the lived . . . when they lived with mom . . . how they used to hit each other and fight with their cousins. And that was according to them. That was reality for them.

Katherine Valencia explained that the children need consistency to be successful in their respective treatments. C.V. admitted that the children were sometimes too much for her, that she was overwhelmed, and that during times of stress she turned to drugs.

### *Relationship Between Father and Children*

One interesting and significant twist permeates this trial. Throughout most of these proceedings, E.G. was in prison and was not part of the children's lives. He was original convicted of robbery in 1999 when he was 18 years old. He was placed on probation, but was revoked in June 2009 for failure to report to his probation officer. He was released on March 1, 2011, but revoked again on March 29, 2011 for a curfew violation. He remained in jail until September 4, 2011. Thus, the trial had been in progress for nearly three months before his release. He contacted the case worker the day after he returned to El Paso and has consistently maintained that he wants all six of the children to live with him. By the end of trial, he was working as a landscaper, and living with his mother and C.V. He was visiting with the four younger children beginning once a week, then every other week, and finally, at the therapist's recommendation, every one or two weeks. Child 1's therapist would not let him visit her at all and gave him no information other than that she had "had a break down." He did talk with Child 2 by telephone almost every other day. He hoped that the family could be reunited, but if he had to choose between his wife and children, he would choose his kids. In that event, he proposed that the children would live with him and his mother.

### *Plans for the Children*

The Department's plan for the children was adoption because there were no suitable relative options for placement. It was hoped that the children could be reunified in one home. This of course was complicated by the fact that the father's rights were not terminated. The

father had suggested his mother and sister as placement options, but his mother was unwilling and his sister was uncooperative. E.G. testified and he and C.V. reunited upon his release from prison. C.V. believed that his presence in her life has improved her situation because he is a support system for her. Her plan was for the children to live with her and her mother. Alternatively, she believed the children should live with her, E.G. and E.G.'s mother. As of January 2012, all but the oldest child expressed a desire to return home.

## GENERAL LEGAL STANDARDS AND BURDENS OF PROOF IN PARENTAL TERMINATION PROCEEDINGS

The natural right of a parent to the care, custody, and control of their children, is one of constitutional magnitude. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see also Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982)(acknowledging that a parent's rights to "the companionship, care, custody, ad management" of their children are constitutional interests, "far more precious than any property right.") However, although parental rights are of constitutional magnitude, such rights are not absolute. *See In the Interest of C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

A parent's rights may be involuntarily terminated through proceedings brought under Section 161.001 of the Texas Family Code. *See* TEX.FAM.CODE ANN. § 161.001 (West 2008). Under this provision, the petitioner must establish: (1) one or more of the acts or omissions enumerated under subsection (1) as grounds for termination; and (2) that of the parent-child relationship is in the child's best interest. *Id.; see also Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)(noting that both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.).

Although parental rights may be terminated, the elevated status of such rights combined with the severity and permanency of termination, requires a petitioner to meet a heightened

burden of proof. [1]  *Santosky*, 455 U.S. at 747, 102 S.Ct. at 1391; *accord Holick*, 685 S.W.2d at 20-21.  Accordingly, the quantum of proof in a termination proceeding is elevated from the preponderance of the evidence to "clear and convincing evidence."  *Santosky*, 455 U.S. at 747, 102 S.Ct. at 1391; *accord Holick*, 685 S.W.2d at 20-21; *see In the Interest of M.S., E.S., D.S., S.S., and N.S.*, 115 S.W.3d 534, 547 (Tex. 2003) and *In the Interest of D.S.P. and H.R.P.*, 210 S.W.3d 776, 778 (Tex.App.--Corpus Christi 2006, no pet.)(cases recognizing that involuntary termination of parental rights is a drastic remedy which divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent.); *see also In the Interest of B.L.D.*, 113 S.W.3d 340, 353-54 (Tex. 2003)(noting that because of the severity and permanency of termination, due process requires the party seeking to terminate parental rights prove the necessary elements by the heightened burden of proof of clear and convincing evidence.).

"Clear and convincing evidence" means the measure or degree of proof that "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  TEX.FAM.CODE ANN. § 101.007 (West 2008); s*ee In the Interest of J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also In the Interest of J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007)(contrasting the standards applied in termination proceedings and the standards applied in modification proceedings); *In the Interest of C.D.*, No. 02-10-00070-CV, 2011 WL 1743688, at *4 (Tex.App.--Fort Worth May 5, 2011, no pet.).  This intermediate standard falls between the preponderance of evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings.  *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979);

---

[1]  This heightened standard is likewise statutorily required.  *See* TEX.FAM.CODE ANN. § 161.001 (stating that, "The court may order termination of the parent-child relationship if the court finds **by clear and convincing evidence . . . .**).  [Emphasis added].

*In the Interest of D.T.*, 34 S.W.3d 625, 630 (Tex.App.--Fort Worth 2000, pet. denied)(op. on reh'g). Although the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570.

## BEST INTEREST OF THE CHILDREN

On appeal, C.V. challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination was in the best interest of the children. In other words, she challenges only the second prong of Section 161.001. Her sufficiency arguments are premised on three grounds: (1) there was insufficient evidence of a plan for permanency given the court's failure to terminate the rights of E.G.; (2) her compliance with service plans was substantial and material; and (3) the children had formed bonded relationships with her as the result of a high degree of maternal nurturing conduct prior to removal.

### *Standards of Review*

The applicable legal and factual sufficiency standards of review are explained in *In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002) and *In re C.H.*, 89 S.W.3d 17 (Tex. 2002). "We hold that the appellate standard for reviewing termination findings is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d at 25.

In reviewing a legal sufficiency claim we consider all of the evidence in the light most favorable to the trial court's finding, "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005), *quoting In re J.F.C.*, 96 S.W.3d at 266. We give deference to the factfinder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and

presume the factfinder resolved any disputed facts in favor of its findings, so long as a reasonable factfinder could do so. *Id.*; *In re J.F.C.*, 96 S.W.3d at 266. We disregard any evidence that a reasonable factfinder could have disbelieved, or found to have been incredible, but we do not disregard undisputed facts. *In re J.P.B.*, 180 S.W.3d at 573; *In re J.F.C.*, 96 S.W.3d at 266. A legal sufficiency or no evidence point will only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *See Swinney v. Mosher*, 830 S.W.2d 187, 194 (Tex.App.--Fort Worth 1992, writ denied).

When addressing a factual sufficiency complaint, we must assess the entire record to determine whether the evidence permits "a factfinder [to] reasonably form a firm belief or conviction about the truth of the State's allegations." *In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 25. Unlike in a legal sufficiency review, our focus in reviewing a factual sufficiency complaint is not based simply upon the undisputed evidence that supports the verdict but the disputed evidence as well. *In re J.F.C.*, 96 S.W.3d at 266. "Implicit in the standard is our obligation to accord the factfinder the deference needed for it to fulfill its role." *In re J.H.M.*, No. 07-07-0109-CV, 2009 WL 5174364, *9 (Tex.App.--Amarillo Dec. 29, 2009, no pet.), *citing In re C.H.*, 89 S.W.3d at 25-26.

### *Factors to Consider*

When determining the child's best interest, the focus is on the child and not the parent. *See In re R.F.*, 115 S.W.3d 804, 812 (Tex.App.--Dallas 2003, no pet.). A strong presumption exists that it is in the child's best interest to preserve the parent-child relationship. *Swate v.*

- 14 -

*Swate*, 72 S.W.3d 763, 767 (Tex.App.--Waco 2002, pet. denied). However, the presumption in favor of the parent-child relationship may be overcome. The Supreme Court has clearly articulated the factors which a trial court should consider in determining the best interest of the child. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The *Holley* factors are:

1. the desires of the child;

2. the present and future physical and emotional needs of the child;

3. the present and future emotional and physical danger to the child;

4. the parental abilities of the persons seeking custody in promoting the best interest of the child;

5. the programs available to assist these individuals to promote the best interest of the child;

6. the plans for the child by the individuals or agency seeking custody;

7. the stability of the home or proposed placement;

8. acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and

9. any excuse for the parent's acts or omissions.

*Analysis*

Teresa Garcia is the ongoing CPS case worker for all of the children, although she is the fourth to be assigned. She testified that the Department's permanency recommendation was termination of parental rights. Child 1 has made outcries of sexual abuse, has engaged in sexualized behavior that she claims she learned from her mother, and is afraid of her parents. She believes that her mother will not protect her and she is afraid that her father will hit her. The girl related circumstances of family violence against her mother and her siblings.

Garcia explained that C.V. has repeatedly missed medical appointments and visitation with the children. The mother admitted that she is unable to handle the children, it is too much

for her, and she feels overwhelmed. As a result of the stress, she relapses and returns to drug usage. Her support system is composed of the relatives that have caused harm to the children, including alleged sexual abuse. The fundamental issue was the mother's inability to care for her six children alone. She tended to blame events or others for all of her missteps. She denied taking ecstasy -- someone else put it in her drink. She denied taking cocaine -- she simply had it on her hands when picking up the baby. Even after completion of the court-ordered substance abuse treatment program, she continued to use drugs. The coordinator of the drug court believed she would have benefited from inpatient treatment, but she did not seek help from the Department nor did she self-admit. She blamed missed visitations or therapy appointments on others who gave her wrong directions, or she had a flat tire. The fact that C.V. did not grasp or understand the severity of the children's physical, neurological, psychological, and physical problems concerned Dr. Carreon.

> Clearly, children need a great deal in terms of a family environment that is stable, that is consistent, that is nonthreatening, for whatever reason that might be, so that the child then can involve themselves in the process of development. Otherwise, if you don't have those ingredients, then you have impediments to the child's development.

*****

> And any family, even under the best of conditions, would need a lot of services, would need to know when to seek those services, would need to be able to follow through with those services, be persistent, consistent, all those kinds of things, that under the best of conditions -- as I've seen many families, who -- parents, again, who I would say would function at a high level and they struggle quite a bit to try to meet the needs of their children. So that I can say, that if he was to return to his biological family, there's -- a lot of conditions would need to be met, even when the courts are not involved.

Katherine Valencia echoed his concerns:

> I think in looking at the case as a whole for these four children, and the time that I've been involved with these four children for the last year, in implementing the services that they need, in understanding mom has had a relapse, information was

given to us that she had the relapse earlier this year, I think for these kids, they have to have stability and consistency. And when a mom is still trying to deal with her issues and still going through recovery, it would be difficult -- may be difficult for her -- if she's not healthy enough, she may not be able to support all these kids' needs. And to miss a psychiatric appointment, when you're looking at kids that are taking psychotropic drugs, and to not understand their needs or their behaviors, could be detrimental to the children. The children, themselves, are at a very critical age of development. And so for a mom that's not understanding, receptive and consistent, that is a challenge.

C.V.'s attorney argued that she doesn't have much initiative. She depends on a solid support system. While E.G. was in jail, C.V. turned back to drugs. She also violated the Department's insistence that other relatives not visit. While she perceived them as a safety net, the record reveals that they were a danger to the children. C.V.'s own mother was validated by the Department as neglecting the children while they were placed with her. We thus reject her argument that her compliance with the safety plan was substantial and material. We also reject her argument that the children had bonded because of a high degree of nurturing conduct. Numerous witnesses described C.V.'s failure to interact with the children or to intervene when dangerous and violent behavior erupted. Dr. Carreon also explained how at least one child had a pathological fantasy of returning to an intact and functional family structure.

Finally, the failure of the trial court to terminate the father's rights is not before us and we do not express an opinion thereon. Nevertheless, C.V. argues that since the trial court did not terminate the father's rights, the couple's ability to reunite the family weighs against a finding of best interest. In other words, the court could not find that it was in the children's best interest to terminate her when she was living with E.G. and "stability" had returned. She directs us to no authority in support of this argument. She also contends that there is no plan for permanency as long as E.G's rights are not terminated. We reject this argument for two reasons. First, C.V. herself suggested placement with her, E. G. and his mother. Second, the court need not consider

"the couple" when addressing the parenting ability of each individual seeking custody. The needs of these children are highly significant and of long standing duration. E.G. returned to jail in June 2009. The initial intake on the children was received the month before based on allegations that E.G. had hit Child 1 with a belt. C.V. failed a drug assessment and the children were placed with her mother. By December 2009, all six had been removed. Certainly the factfinder could determine by clear and convincing evidence that the violent and aggressive behavior of the children -- toward themselves and others -- stemmed from more than a weak support system in the household. There was also evidence of turbulence and domestic violence in the home. That the trial judge may have been willing to give the father a second chance does not require a finding that termination of the mother was not in the children's best interest. We look only to the conduct, behavior, circumstances, and reasons offered by the mother. And as the Department's attorney suggested, sometimes love is not enough. *See In re C.H.*, 89 S.W.3d at 26 (noting that, "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

We conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination was in the children's best interest. We give deference to the factfinder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and presume the factfinder resolved any disputed facts in favor of its findings, so long as a reasonable factfinder could do so. We disregard any evidence that a reasonable factfinder could have disbelieved, or found to have been incredible, but we do not disregard undisputed facts. From this voluminous record, we can discern that all but one of the children wanted to return to their mother. But we can visualize the significant physical and emotional needs of all of these

children. There continues to be a threat of future emotional and physical danger to the children. C.V. is lacking the parental abilities necessary to interact appropriately with the children, divert or redirect their attention when they engage in inappropriate activity, participate fully and regularly in their therapy sessions, and protect them from family aggression. C.V. has had programs available to assist her. The personnel of the drug court offered to help her obtain in-patient drug treatment, but C.V. never followed through. During visitations, it was Department personnel who redirected the children while C.V. sat by and watched. Her first plan for permanency was that she and the children would live with her mother, who had already been validated as negligent when the children were living with her. She cannot provide stability inasmuch as the children and their problems frequently cause her to become overwhelmed. The record demonstrates that she disbelieved her daughter's claims of sexual assault, she failed to seek medical advice when her six-year-old suffered from recurrent encopresis, she failed to protect her children from recurring domestic violence, and she exposed her children to inappropriate sexual behavior. Her excuses are aimed at blaming others or insisting that stability could be restored once E.G. was released from prison and living with her. The evidence is therefore legally sufficient to support termination. We also find it to be factually sufficient. We have reviewed the entire record and considered not only the undisputed evidence but the disputed evidence as well. We overrule Issues One and Two and affirm the judgment of the trial court below.

April 30, 2013

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.
Antcliff, J., not participating