

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| T.W., | | No. 08-13-00286-CV |
| | § | |
| Appellant, | | Appeal from the |
| | § | |
| v. | | 65th District Court |
| | § | |
| TEXAS DEPARTMENT OF FAMILY | | of El Paso County, Texas |
| AND PROTECTIVE SERVICES, | § | |
| | | (TC# 2012DCM06694) |
| Appellee. | § | |

## **O P I N I O N**

T.W. appeals from a judgment terminating his parental rights to his child A.R.W. T.W. raises four issues for our review.[1] In Issue One, he contends the trial court erred in failing to apply the equal inference rule[2] and that inferences from the invocation of his Fifth Amendment privilege should not have been considered for any purpose. In Issue Two, he asserts the trial court erred in excluding evidence relating to the suitability of A.R.W.'s paternal aunt as a placement for the child. In Issues Three and Four, T.W. challenges the sufficiency of the evidence supporting the trial court's best interest finding. We address Issues Three and Four together. We affirm.

---

[1] T.W.'s appeal focuses solely on the trial court's best interest finding.

[2] "The equal inference rule provides that a [fact finder] may not reasonably infer an ultimate fact from meager circumstantial evidence 'which could give rise to any number of inferences, none more probable than another.'" *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001) (quoting *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997)).

**BACKGROUND**

The Texas Department of Family and Protective Services ("the Department") was previously involved in a case concerning A.R.W.'s sister in 2010. T.W.'s parental rights to that child were terminated in 2011. A.R.W. came under the care and custody of the Department in July 2012 after being removed from the home of her paternal aunt due to allegations of drug abuse in the home and neglectful supervision.[3] At that time, A.R.W. had never resided with T.W. as he had left her in the care of his sister almost immediately after she was born. The record of the termination bench trial reflects that the Department set up a service plan for T.W and discussed that plan with him in August 2012. On that occasion, T.W. informed the Department that he had been arrested for possession of a controlled substance and was on probation. T.W. failed to complete his plan and was inconsistent in his visitations with A.R.W. At trial, when asked if he knew he had to take parenting classes, T.W. answered, "I did it in my last case and I completed it with – I did everything that the court wanted me to in my power in the first case and then I was asked to do it again and I didn't do it again."

In April 2013, T.W. was arrested. Although a motion to revoke his probation was subsequently filed, T.W. was released from jail. He was rearrested in September 2013 under an outstanding bench warrant. Officer Cynthia Renteria explained that when she attempted to carry out that bench warrant T.W. stated, "Look, lady, I don't care if you're a female, don't fuck with me, you don't know who I am and I don't care if I get added charges." When T.W. continued to evade arrest, Officer Renteria requested additional assistance. Another officer arrested T.W. and then turned him over to Officer Renteria. At the time of trial, T.W. was still incarcerated and he did not know when he was supposed to be released. T.W. agreed that he

---

[3] The paternal aunt's own children were also removed from the home.

could not care for A.R.W. during his incarceration. He stated that he wanted his daughter to live with his sister and that he felt placing A.R.W. with his sister was in the child's best interest.

Myrna Calzada, A.R.W.'s caseworker, testified that A.R.W. told her that her paternal aunt was her "mommy." According to Calzada, A.R.W. was very bonded to the paternal aunt. Veronica Esqueda, the Department's investigator on A.R.W.'s case, testified A.R.W. was removed from her paternal aunt's home after the paternal aunt tested positive for drugs and after she was validated for neglectful supervision of A.R.W. and her own children. The paternal aunt exposed A.R.W. to inappropriate people including her husband, J.O., who was physically violent with his wife while the children were in the home, a man named K.G., who allegedly sexually abused A.R.W.'s cousin, and her "ex-boyfriend" V.T., who has an extensive criminal history. The record reflects that the paternal aunt also has an extensive criminal history which includes prostitution, evading arrest, possession of marijuana, shoplifting, and theft. After A.R.W.'s removal from her home, the paternal aunt violated her safety plan with the Department by taking A.R.W. and her own children to the home of V.T.'s mother. At that time, there was also a concern that the children were exposed to K.G. Calzada explained that the Department considered the paternal aunt as a possible placement for A.R.W., but the paternal aunt was found to be an inappropriate placement at that time. Because the Department needed to find an appropriate home for A.R.W., the Department placed A.R.W. with her sibling in June 2013.

At trial, the paternal aunt testified she did not feel T.W.'s parental rights should be terminated and that he loves his kids. She testified that it was in A.R.W.'s best interest to maintain a relationship with her family. It was also her recommendation that A.R.W. go back with her father. She stated that her own children had been returned to her and explained that if her brother's parental rights were maintained she would be able to take care of A.R.W.

After hearing all the testimony and considering the evidence, the trial court found clear and convincing evidence to support termination of T.W.'s parental rights under sections 161.001(1)(D), (E), (M), (N), and (O) of the Texas Family Code, and that termination was in the best interest of A.R.W. *See* TEX. FAM. CODE ANN. §§ 161.001(1)(D), (E), (M), (N), (O), (2) (West 2008). This appeal followed.

## DISCUSSION

*Standard of Review*

Involuntary termination of parental rights is a grave matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). In a proceeding to terminate parental rights, the petitioner must demonstrate by clear and convincing evidence that: (1) the parent committed one or more of the acts specifically set forth in Texas Family Code section 161.001(1) as grounds for termination; and (2) that termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001 (West 2008). "Clear and convincing evidence" means the measure or degree of proof that "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008); *see In the Interest of J.F.C.,* 96 S.W.3d 256, 263 (Tex. 2002); *see also In the Interest of J.A.J.,* 243 S.W.3d 611, 616 (Tex. 2007) (contrasting the standards applied in termination proceedings and the standards applied in modification proceedings). We strictly scrutinize termination proceedings and construe any statutes authorizing involuntary termination in favor of the parent. *Holick*, 685 S.W.2d at 20-21.

When reviewing legal sufficiency challenges to termination findings, we consider all of the evidence in the light most favorable to the finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.P.B.,* 180 S.W.3d

4

570, 573 (Tex. 2005), *quoting In re J.F.C.,* 96 S.W.3d at 266. We give deference to the fact finder's conclusions and presume the fact finder resolved any disputed facts in favor of its findings, so long as a reasonable fact finder could do so. *Id.; In re J.F.C.,* 96 S.W.3d at 266. We disregard any evidence that a reasonable fact finder could have disbelieved, or found to have been incredible, but we do not disregard undisputed facts. *In re J.P.B.,* 180 S.W.3d at 573; *In re J.F.C.,* 96 S.W.3d at 266.

In reviewing the evidence for factual sufficiency, we must give due deference to the fact finder's findings, and we cannot supplement such judgment with our own. *In the Interest of H.R.M.,* 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.,* 209 S.W.3d at 108; *In re J.F.C.,* 96 S.W.3d at 266.

### T.W.'S FIFTH AMENDMENT INVOCATION

In Issue One, T.W. argues the trial court failed to apply the equal inference rule and asserts that "a negative inference should not be drawn from a claim of privilege . . . raised by [him] in connection with considering whether there was clear and convincing evidence . . . on the grounds of best interests." T.W. contends a negative inference should not be drawn from his Fifth Amendment assertions concerning his failure to engage in services, whether he had contacts with law enforcement leading to the revocation of his probation, and about his past drug use. The Department responds the equal inference rule is inapplicable because there was direct evidence from which the trial court could have reached a negative inference as to each of T.W.'s assertions and properly determined there was clear and convincing evidence in support of its best interest

5

finding. In support of its argument, the Department references the following direct evidence: (1) T.W. failed to complete his service plan; (2) T.W. attempted to evade arrest in August 2013;[4] (3) T.W. tested positive for drugs in 2010; and (4) T.W. continued to engage in criminal activity prior to and during the pendency of the case. The Department also points out that other evidence supported the trial court's ruling including: (1) the child's strong preference to remain with her foster family; (2) T.W.'s current and past incarcerations; (3) T.W.'s vague and generalized plan for the child's future; (4) T.W.'s desire to place the child with an inappropriate caregiver; (5) T.W.'s lack of relationship with the child and his failure to bond with her; (6) T.W.'s failure to consistently attend visitation; and (7) T.W.'s admission that he was not currently in a position to care for the child.

In a civil case, the trier of fact may make reasonable inferences from a party's assertion of the privilege against self-incrimination. *See Lozano*, 52 S.W.3d at 150; *In re C.J.F.*, 134 S.W.3d 343, 352-53 (Tex.App. – Amarillo 2003, pet. denied) (applying *Lozano* in parental-rights termination case). Here, without deciding whether the equal inference rule applies we conclude the trial court's best interest finding is supported by clear and convincing direct evidence rendering T.W.'s equal inference argument moot. *See R.H. v. Tex. Dep't of Family & Protective Servs.*, No. 08-12-00363-CV, --- S.W.3d ----, 2013 WL 1281773, at *7 (Tex.App. – El Paso Mar. 28, 2013, no pet.) (assuming without deciding that equal inference rule applied and concluding best interest finding supported by clear and convincing direct evidence from other witnesses). Issue One is overruled.

## EXCLUSION OF EVIDENCE

---

[4] Although the Department references August 2013 as the applicable date the record reflects that the correct date is September 2013.

6

In Issue Two, T.W. complains about the trial court's decision to exclude evidence. Specifically, he objects to the exclusion of evidence regarding the suitability of returning A.R.W. to the care of her paternal aunt. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009); *In re J.P.B.*, 180 S.W.3d at 575. A trial court abuses its discretion if it acts without reference to any guiding rules or principles or if its actions are arbitrary and unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). In order for us to reverse a case based on an erroneous evidentiary ruling, the error must have been harmful, in other words, unless it probably caused the rendition of an improper judgment. *In re K.S.*, 76 S.W.3d 36, 42 (Tex.App. – Amarillo 2002, no pet.); *see* TEX.R.APP.P 44.1(a). Moreover, as the complainant, T.W. must also show that the judgment turns on the specific evidence excluded or admitted. *In re K.S.*, 76 S.W.3d at 42.

T.W. argues the trial court erred in preventing the development of testimony that it was in A.R.W.'s best interest to be placed with her paternal aunt because that evidence was relevant and central to his defense concerning the child's best interest. According to T.W., this evidence would have preserved the parent-child relationship and thus, he argues the evidence is directly relevant to A.R.W.'s best interests. As such, T.W. maintains the trial court's ruling "was without reference to relevant legal authority and arbitrary." The Department responds that the trial court did not abuse its discretion in excluding the complained-of evidence because it was not required to consider any alternatives to termination, and points out that the focus of the trial court's best interest finding is on the child, not the parent. We agree with the Department.

In essence, T.W.'s complaint concerns the Department's attempts to reunify A.R.W. with family. While it is presumed that it is in the child's best interest to preserve the parent-child

7

relationship, the requirement to show that termination is in the child's best interest in addition to the clear and convincing standard of proof subsumes reunification issues and guarantees the constitutionality of termination proceedings. *Edwards v. Tex. Dep't of Protective & Regulatory Servs.*, 946 S.W.2d 130, 138 (Tex.App. – El Paso 1997, no writ), *disapproved of on other grounds by In re J.F.C.* 96 S.W.3d at 267, n.39. A separate consideration of alternatives to termination is not required. *Navarrette v. Texas Dep't of Human Res.*, 669 S.W.2d 849, 852 (Tex.App. – El Paso 1984, no writ). When determining the child's best interest, the focus is on the child and not the parent. *C.V v. Tex. Dep't of Family & Protective Servs.*, 408 S.W.3d 495, 504 (Tex.App. – El Paso 2013, no pet.). Moreover, while the determination of where a child will be placed is a factor in determining the child's best interest, the fact that the placement will be with non-relatives is not a bar to termination. *In re A.L.*, 389 S.W.3d 896, 902 (Tex.App. – Houston [14th Dist.] 2012, no pet.); *see Rogers v. Dep't. of Family & Protective Servs.*, 175 S.W.3d 370, 379 (Tex.App. – Houston [1st Dist.] 2005, pet. dism'd w.o.j.) (whether relatives seek to have children placed in their homes is irrelevant to whether termination of parental rights is in the best interest of the child); *see also In re C.C.*, No. 2-04-206-CV, 2005 WL 1244672, at *6-7 (Tex.App. – Fort Worth May 26, 2005, no pet.) (mem. op.) (citing *In the Interest of C.H.*, 89 S.W.3d 17, 28 (Tex. 2002), and pointing out that the Department does not have a duty to place a child with a relative before a parent's rights can be terminated; the fact that placement plans are not final or that there will be a non-relative placement is not a bar to termination).

T.W. asserts the exclusion of the complained-of evidence was prejudicial; however, he fails to show how the exclusion of that evidence harmed him, *i.e.*, probably caused the rendition of an improper judgment. Because a best interest determination focuses on the child, and not the

8

parent, and the trial court was not required to consider alternatives to termination, the trial court did not abuse its discretion in excluding the complained-of evidence. *Whirlpool Corp.*, 298 S.W.3d at 638; *In re J.P.B.*, 180 S.W.3d at 575. And, even if the trial court erred in excluding the evidence, we could not conclude, based on the record, that the error probably caused the rendition of an improper judgment or that the judgment turned on the specific evidence excluded. *See In re K.S.*, 76 S.W.3d at 42; *see* TEX.R.APP.P 44.1(a). Issue Two is overruled.

## BEST INEREST OF THE CHILD

In Issues Three and Four, T.W. argues the evidence is legally and factually insufficient to show that termination was in the best interest of A.R.W. T.W. maintains the Department failed to show termination was in the child's best interests by clear and convincing evidence. We disagree.

There is a strong presumption that a child's best interests are served by maintaining the parent-child relationship. *In re S.M.,* 389 S.W.3d 483, 493 (Tex.App. – El Paso 2012, no pet.). In *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976), the Texas Supreme Court has identified nine non-exhaustive factors that are relevant in determining whether termination of parental rights is in the best interest of the child. The nine non-exhaustive *Holley* factors are: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omission committed by the parent which may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions committed by the parent. *Holley*, 544 S.W.2d at 371-72.

The determination of a child's best interest does not require proof of any unique set of

9

factors, and it does not limit proof to any specific factors. *In the Interest of C.H.,* 89 S.W.3d at 28. The same evidence used to establish grounds for termination under Section 161.001(1) may be probative in determining whether termination of parental rights is in the best interest of the child under Section 161.001(2). *See* TEX. FAM. CODE ANN. § 161.001 (West 2008); *In re S.M.,* 389 S.W.3d at 492-94, *citing In the Interest of C.H.,* 89 S.W.3d at 28. With these considerations in mind, we review the evidence presented below.

*Desires of the Child*

The record reflects that A.R.W. was six years old at the time of trial. Calzada testified that A.R.W. was placed out of state in a foster home where her biological sister also resided, that A.R.W. was doing very well in that home, and that A.R.W. was very attached to her sister. A.R.W. has never asked for T.W. during her current placement. When asked if A.R.W. had expressed where she wanted to live, Calzada explained that A.R.W. is happy where she is at and wants to live where she is currently placed. A.R.W. refers to her current foster parent as "mom." A.R.W.'s current foster parent testified that A.R.W. has lived with her for four months, and is doing good. A.R.W. told her foster parent that she wants to live with them "forever and ever and ever and ever."

Without any citation to the record, T.W. asserts the evidence shows that A.R.W. was bonded to her paternal aunt, and that she was bonded to her cousins with whom she was raised. However, T.W. does not present any evidence regarding the child's desires with respect to himself. Based on this evidence, the trial court could have reasonably found that A.R.W. desired to remain in her current foster placement. *See In re J.L.C.*, 194 S.W.3d 667, 675 (Tex.App. – Fort Worth 2006, no pet.) (evidence of child's desire to remain with foster parents established by child's affection and attachment to them). This factor weighs in favor of

termination.

*Emotional & Physical Needs of the Child and Emotional &Physical Danger to the Child*

T.W. contends there is no evidence he engaged in any endangering or abusive conduct toward his daughter. As to his ability to satisfy A.R.W.'s emotional and physical needs now and in the future, T.W. does not raise any arguments as to his own abilities, but instead argues the Department did not present any evidence that the parenting skills of the foster parent would outweigh the benefits of placing A.R.W. with her paternal aunt. He similarly argues that to the extent there was any evidence of endangerment to A.R.W. prior to her removal from the paternal aunt's home, the endangerment factors have been remediated as evidenced by the return of the paternal aunt's own children to that home. T.W. further asserts that any evidence of endangerment occasioned by his own relationship to A.R.W. was speculative.

A child needs permanency and security. The emotional and physical dangers to A.R.W. now and in the future are substantial given T.W.'s track record and his failure to remedy his parental shortcomings. The evidence shows that T.W. never raised A.R.W. as he placed the child in his sister's care when she was just two days old. Calzada testified that T.W. was inconsistent with his visitations with A.R.W. and explained that during T.W.'s supervised visits with the child, A.R.W. would have to be redirected to spend time with her dad and was uncomfortable. It did not appear to Calzada that T.W. and A.R.W. had a father-daughter bond.

A.R.W. was removed from her paternal aunt's home based on allegations of drug use, domestic violence, and neglectful supervision. At that time, the paternal aunt tested positive for drugs and stated that she was a victim of domestic violence. After considering the paternal aunt's home as a possible placement for A.R.W., the Department determined the paternal aunt's home was not an appropriate home for A.R.W. During the Department's investigation,

11

Esqueda attempted to speak with T.W. on five different occasions. T.W. never asked if A.R.W. would be removed, where she would be placed, or if the child could go with him.

The evidence further shows T.W. failed to provide financial assistance or medical insurance for A.R.W. during the pendency of this case and did not provide proof of his employment. At the time of trial, T.W. had not seen A.R.W. in eight months, he was incarcerated, he did not know when he would be released, and agreed that he could not care for his daughter at that time. Based on this evidence, the trial court could have reasonably concluded that T.W. was incapable of meeting the physical and emotional needs of A.R.W. Additionally, based on this evidence and T.W.'s past performance as a parent and his extensive criminal history,[5] the trial court could have reasonably concluded that T.W. presented an emotional and physical danger to A.R.W. now and in the future. *See In the Interest of C.H.*, 89 S.W.3d at 28 (finding termination in child's best interest where father failed to provide emotional or financial support and had an extensive criminal history). These factors favor termination.

*Parenting Abilities and Programs Available*

The record reflects T.W.'s parental rights to A.R.W.'s sister were terminated in 2011.[6] During that case, the Department tried to gain information about A.R.W.'s whereabouts from T.W. T.W. informed the caseworker that A.R.W. was with his sister, but he would not provide her with an address or contact information for A.R.W.

During the pendency of A.R.W.'s case, the Department offered services to T.W. A service plan was reviewed and signed by T.W. In part, T.W. was asked to complete a

---

[5] The record reflects T.W.'s criminal record, in part, included charges for assault of a public servant and unlawful possession of a controlled substance.
[6] The Department removed A.R.W.'s younger sister from T.W.'s home due to suspected drug abuse in the home and the child testing positive for drugs at that time. In that case, T.W. tested positive for ecstasy and cocaine.

psychological evaluation, OSAR substance abuse assessment, individual therapy, supervised visitation, and parenting classes. T.W. did not complete his psychological evaluation, and although he completed an OSAR assessment, he reported that he had not tested positive for methamphetamines and cocaine in a previous drug test. He did not attend individual therapy sessions or parenting classes.

T.W. was not consistent with his visits with A.R.W.[7] T.W. did not provide the Department with verification of employment or his community resources. T.W. did not refrain from criminal involvement and did not comply with his probation terms. He did not pay any child support or medical insurance for A.R.W during the case. It did not appear to Calzada that T.W. and A.R.W. had a father-daughter bond. Calzada testified that termination was in A.R.W.'s best interest because T.W. had not complied with any of the services and was not consistent in visiting with the child. She further stated, "[T.W.'s] current situation would not allow him to be able to care and provide for [A.R.W.]. He has not demonstrated the ability to build a relationship with A.R.W."

At the time of trial, T.W. had not seen A.R.W. in eight months, he was incarcerated and did not know when he would be released. T.W. agreed that he could not take care of A.R.W. while in jail. Although T.W. testified that he loved his daughter the evidence reflects that he did not and could not provide for her physical and emotional needs and that he exhibited a lack of interest in participating in the service plan related to A.R.W. The trial court was entitled to determine that these factors weighed in favor of termination.

*Plan for the Child and Stability of the Home or Proposed Placement*

On appeal, T.W. argues the evidence below showed that his sister would continue to

---

[7] The record reflects that T.W. missed 20 of his 41 scheduled visits with A.R.W.

provide care for A.R.W. At trial, T.W. stated that his plan once he was released from jail was to work and go to school. His plan for A.R.W. was to take care of her, keep a roof over her head, keep her in school, and give her a better future. T.W. did not know when he would be released from jail. T.W. believed that it was in A.R.W.'s best interest to stay with his sister and he asked the court to place her with his sister.

The record establishes A.R.W. was removed from the paternal aunt's home due to concerns of drug usage in the home and neglectful supervision. The paternal aunt tested positive for marijuana and has an extensive criminal history that continued up until the month before trial. While in the home of the paternal aunt, A.R.W. witnessed domestic violence and was allowed to be around and cared for by inappropriate individuals. At trial, the paternal aunt conceded that having a relationship with V.T. was a barrier to having contact with A.R.W., and while she told the Department she was no longer in contact with him, the evidence showed she was arrested with him in December 2012, she continued to visit him in jail, deposited money into his account, and had phone conversations of a sexual nature with him throughout 2013.

T.W. testified that he thought his sister had a good living environment for A.R.W. and that her home was stable. He was not sure how often she moved and was aware that she was having financial problems due to her divorce. He also did not know whether his sister had gotten divorced from her husband as he had not spoken with her in six months.

In contrast, the Department recommended that T.W.'s parental rights be terminated in order to give A.R.W. permanency through adoption. A.R.W.'s current foster family are willing to adopt her and are able to provide a safe and stable and loving home for the child. The record does not reveal any instability in the home of A.R.W.'s current foster family. Rather, it reflects A.R.W. is stable, happy, well cared for, and that she has bonded with her biological sister.

14

Moreover, the record reflects the Department looked at the paternal aunt as a possible placement for the child, but determined it was not appropriate to place her in that home at the time. Because T.W.'s plans to have his sister care for A.R.W. while he is incarcerated are unrealistic, weak, ill-defined, and the paternal aunt was previously looked at by the Department and found to be an inappropriate placement at that time, the trial court could have weighed these factors in favor of termination of T.W.'s parental rights. *See D.O. v. Tex. Dep't of Hum. Servs.*, 851 S.W.2d 351, 356 (Tex.App. – Austin 1993, no writ) (the trier of fact may compare parent's and Department's plans in determining best interest of the child and consider whether respective plans and expectations of each party are realistic or weak and ill-defined).

*Acts or Omissions by Parent and Any Excuses for Parent's Acts or Omissions*

It is uncontroverted that T.W. failed to comply with the requirements of his service plan, had not had any contact with A.R.W. for eight months, and due to his incarceration was unable to care for A.R.W. at the time of trial. On appeal, T.W. asserts that he suffered severe stressors that impacted his ability to complete the services that were necessary to obtain return of the child. Without providing any citation to the record, T.W. states that during the pendency of the case, he was prevented from engaging in services due to his mental health, the serious physical injuries he experienced, and because he was required to care for his father who died during the course of the case.

As to T.W.'s mental health problems,[8] Calzada testified that during the eight months prior to T.W.'s incarceration, when T.W. had the opportunity to comply with services, she did not have any information indicating T.W. was unable to complete the services due to a

---

[8] During T.W.'s incarceration, Calzada received information that T.W. was diagnosed with depression and bipolar. We note that during closing arguments, T.W. also mentioned having been recently diagnosed with schizophrenia and posttraumatic stress disorder.

15

psychiatric or psychological disorder. She further stated that in her experience as a caseworker she encountered parents diagnosed with depression and being bipolar who were able to complete services and safely parent children. According to Calzada, everything that surrounded T.W.'s mental health issues did not impact his ability to complete the service plan.

As to T.W.'s alleged physical injuries, the record reflects that T.W. attempted to show that he was unable to complete his services because of a leg injury he allegedly suffered during a car accident. However, Calzada testified T.W. never told her that his leg injury was a reason that he could not complete his visits or make his appointments. T.W. never provided Calzada with any medical documentation showing any injury to his leg or that such an injury would prevent him from being able to travel. Similarly, Margarita Guerra, the caseworker assigned to T.W.'s 2010 case involving A.R.W.'s sibling, testified that in that case, T.W. told her that he was in a car accident and that he was receiving physical therapy, but he never explained that his leg injury was a reason that he did not complete his services or attend visits.

In relation to the stress of having to care for his father and then deal with his father's death, the record reflects that T.W. would have had access to grief counseling had he attended his individual therapy sessions. Both Calzada and the caseworker in A.R.W.'s younger sister's case, testified that T.W. never requested grief counseling. Although the issue of grief counseling was discussed with T.W., he still failed to complete individual counseling. Moreover, Calzada testified that she knew T.W.'s father was living with him, but she was never provided with information that T.W. was caring for his father because he was terminally ill.

T.W. asserts that his decision to place A.R.W. with his sister and his decision to not take any steps to interrupt that relationship is evidence that he could make important decisions in the best interest of his child. However, the record shows that T.W. had discussions with his sister

16

about him taking A.R.W. back, but his sister refused because she did not feel good about A.R.W. going back to her parents and the child was happy with her. As discussed above, the evidence also shows the Department considered the paternal aunt's home to be inappropriate for A.R.W. Thus, the trial court could have concluded that T.W.'s decision to place A.R.W. with his sister was a poorly made one that was not in the child's best interest.

Based on the evidence presented, the trial court was free to disbelieve some or all of T.W.'s excuses and reasonably could have formed a firm belief or conviction that his excuses for his actions and inactions were inadequate. The trial court could also reasonably have formed a firm belief and conviction that T.W.'s acts and omissions do not support an appropriate parent-child relationship. These factors favor termination.

Considering all of the evidence in the light most favorable to the finding, we conclude the evidence is legally sufficient because a reasonable trier of fact could have formed a firm belief or conviction that its finding that termination of T.W.'s parental rights was in the best interest of the child. *In re J.P.B.*, 180 S.W.3d at 573; *In re J.F.C.*, 96 S.W.3d at 266. In light of the entire record, we determine that the disputed evidence is factually sufficient to permit a fact finder to reasonably form a firm belief or conviction about the truth of the Department's allegations and a finding that termination of T.W.'s parental rights is in the best interest of A.R.W. *See In re H.R.M.*, 209 S.W.3d at 108; *In re J.F.C.*, 96 S.W.3d at 266. Issues Three and Four are overruled.

## CONCLUSION

We affirm the trial court's judgment.


GUADALUPE RIVERA, Justice

March 19, 2014

Before McClure, C.J., Rivera, and Rodriguez, JJ.

17